1   TODD M. MALYNN (SBN 181595)
    Email:  tmalynn@feldmangale.com
2   JAMES A. GALE (Florida Bar No. 371726)
    Email:  jgale@feldmangale.com
3   **FELDMAN GALE, P.A.**
    880 West First Street, Suite 315
4   Los Angeles, California 90012
    Telephone No.  (213) 625-5992
5   Facsimile No.  (213) 625-5993

6   Attorneys for Plaintiff
    Star Envirotech, Inc.

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  STAR ENVIROTECH, INC., a          CASE NO.:
    Delaware corporation,
12                                     COMPLAINT FOR:
               Plaintiff,
13                                     (1) PATENT INFRINGEMENT
         v.                                (35 U.S.C. §271, et seq.);
14
    REDLINE DETECTION, LLC, a         (2) FALSE ADVERTISING
15  California limited liability company;    (15 U.S.C. §1125 (a) ; and
    and KENNETH A. PIERONI, an
16  individual,                        (3) UNFAIR COMPETITION
                                           (CALIF. BUS. & PROF.
17             Defendants.                  CODE § 17200).

18                                     DEMAND FOR JURY TRIAL

19

20

21

22       Star EnviroTech, Inc. ("Star"), for its Complaint against Redline Detection,

23  LLC ("Redline") and Kenneth A. Pieroni ("Pieroni") (collectively, "Defendants"),

24  based upon actual knowledge with respect to Plaintiff and Plaintiff's acts, and upon

25  information and belief as to all other matters alleges as follows:

26                              **Introduction**

27       1.    Star brings this lawsuit to stop Defendants from infringing, and

28  inducing others to infringe, U.S. Patent No. 6,526,808, and from making false and

1  misleading statements about the lack of safety of Star's smoke machine leak
2  detection equipment (the "Star Products"), while simultaneously touting the safety
3  of competing products with which Defendants are affiliated.

4      2.    As alleged below, Defendants' false and misleading statements
5  endanger the public by encouraging testing of vehicle fuel systems with machines
6  that use pressurized atmospheric (or "shop") air, which Defendants know increase
7  the risk of combustion and explosion.

8      3.    As further alleged below, Defendants are well aware that:

9          (a)    It is safer to use nitrogen rather than shop air when leak testing a
10  vehicle fuel system with all smoke producing devices, regardless of the
11  heating element used;

12         (b)    Leak testing a vehicle fuel system with shop air instead of
13  nitrogen increases the risk of combustion and explosion, regardless of the
14  brand of smoke machine leak detection equipment or the type of heating
15  element used;

16         (c)    The temperature of the glow plug used in the Star Products is
17  controlled by a microprocessor that maintains the temperature no higher than
18  is required to vaporize the smoke solution and that includes a "fail safe" that
19  cuts off all power to the glow plug upon detection of any irregularity;

20         (d)    The temperature of the glow plug used in the Star Products is not
21  substantially higher, and is typically lower, than the wire heating elements
22  used in competing devices; and,

23         (e)    The dye that can be used in the Star Products is safe for vehicle
24  systems.

25     4.    Defendants know that their statements are false, misleading, and
26  endanger the public.  The superior safety of using nitrogen instead of shop air has
27  been conclusively demonstrated by independent SAE published papers and
28  Defendants' own prior statements that were made under penalty of perjury.

**The Parties**

5.    Plaintiff Star EnviroTech, Inc. is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business at 17852 Gothard Street, Huntington Beach, California 92647.

6.    Plaintiff is informed and believes, and on that basis alleges, that Defendant Kenneth A. Pieroni is an individual residing in Yorba Linda, California.

7.    Plaintiff is informed and believes, and on that basis alleges, that Defendant Redline Detection, LLC is a limited liability company organized and existing under the laws of the State of California and having a principal place of business at 931 S. Viaduct Rodeo, Placentia, California 92870.

**Jurisdiction and Venue**

8.    This is a civil action for patent infringement, inducement to infringe a patent, false advertising, and unfair competition arising under 35 U.S.C. §§ 271, *et seq.*, 15 U.S.C. § 1125(a) (Section 43(a) of the Lanham Act) and California state law.

9.    This Court has jurisdiction over Star's claims pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court also has supplemental jurisdiction over the California statutory and common law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

10.    This Court has specific and general personal jurisdiction over Defendants by virtue of their residency within the State of California and their actions within the State of California as alleged herein.

11.    Venue in this judicial district is proper under 28 U.S.C. § 1391(b).

**Star's Products and Intellectual Property**

12.    Star is a well-known and highly regarded manufacturer of leak detection equipment.  Star is an innovator in the field, having produced high quality

1 leak detection products for over 12 years, and having received multiple patents on
2 its leak detection technologies.

3       13.    On March 4, 2003, a United States Letters Patent No. 6,526,808 ("the
4 '808 Patent") entitled "Smoke and Clear Air Generating Machine for Detecting
5 Presence and Location of Leaks in a Fluid System" was duly and legally issued to
6 the defendant, Kenneth A. Pieroni and Jim Eli Saffie, president of the Plaintiff
7 corporation, which was subsequently assigned to Plaintiff, Star. A true and correct
8 copy of the '808 Patent is attached as Exhibit "A."

9       14.    Plaintiff Star is the owner of all rights, title and interest in and to the
10 '808 Patent sufficient to bring this action.

11      15.    The Star Products fall within the scope of the claims of the '808 Patent.

12      16.    Star licenses its patented technology to selected distributors for
13 worldwide distribution.

## Defendants' Activities

15      17.    Defendant, Pieroni helped develop Star's early smoke leak detection
16 technology using nitrogen and dye in the late 1990's and is one of the named
17 inventors on the '808 Patent as well as U.S. Patent No. 6,439,031 for a "Method for
18 Detecting Leaks in a Fluid System" ("the '031 Patent").

19      18.    At one point Defendant Pieroni was also a co-owner of Star.

20      19.    After selling his interest in Star, including his interest in the '808 Patent
21 and the '031 Patent, Defendant Pieroni, in conjunction with Defendant Redline,
22 went into competition with Star and misappropriated the Star technology, and
23 embarked upon an aggressive campaign to disparage Star and the Star's Products by
24 making false claims that the Star Products are unsafe and/or dangerous—even while
25 they were copying Star's and infringing Star's patents.

26      20.    Defendants even went so far as to seek reexamination of Plaintiff's
27 patents—the very patents which Pieroni invented—in an effort to invalidate said
28 patents.

21.   However, the PTO rejected Defendants' attempts to invalidate Plaintiff's patents, either in whole or in part, and have fully affirmed the validity of those patents.

22.   Specifically, Defendants have imported, used, sold, and distributed leak detection systems under the name, "Complete Air Smoke Pro" and "Smoke Pro Total Tech" (the "Infringing Products"), which infringe the claims of the '808 Patent.

23.   Additionally, Defendants have encouraged others to infringe Plaintiff's patented technology by causing third parties to use Plaintiff's technology by causing them to believe that Plaintiff's patents are invalid and that Plaintiff's technology is not protected.

24.   Moreover, Defendants have made numerous false and disparaging statements (the "Statements") relating to the Star Products.  Defendants knew the Statements were false and disparaging, knew the false and disparaging information would injure Star in California and elsewhere, and intended that the Statements injure Star.

25.   Some of the Statements were published at websites located at RedLineDetection.com and SmokeMachineFacts.com (the "Websites").   On the Websites, Defendants mischaracterize the Star Products to give the false impression that the Star Products are unsafe, and falsely state that the Star Products are "dangerous."

26.   The false and disparaging Statements included statements that were published by Defendants or with Defendants' consent on the website located at SmokeMachineFacts.com. On the website, Defendants make numerous disparaging Statements including, but not limited to:

> "The concern with the glowplug, is it gets so hot so fast, it poses some problems which is why we started using nitrogen to keep the machine from dieseling;"

"Nitrogen was originally introduced as a method to keep glow plug smoke machines from dieseling in [sic] causing harm to the machines themselves."

"At the time we said we couldn't get the glow plug under control, so we used nitrogen;"

When asked "If smoke machines are so safe, are you suggestion [sic] for me to use my glow plug smoke machine without nitrogen?"

Defendants responded "ABSOLUTELY NOT!!!"

These Statements mischaracterize the Star Products to give the false impression that the Star Products are unsafe and/or are comparatively less safe than products that do not use glow plugs.

27.     The false and The false and disparaging Statements included statements that were published by Defendants or with Defendants' consent on the website located at RedLineDetection.com.   On the website, in Defendant Pieroni's biography, Defendants make numerous disparaging Statements about the Star products including, but not limited to:

"One patent in Pieroni's name is for the use of nitrogen so as to alleviate dieseling in the smoke chamber which has plagued glow plug machines and is still used in the old technology today;"

"It must be noted that none of [Champion Engineering, Global Leak Detection, Star EnviroTech, Vacutec] nor OTC, Snap On, MotorVac, etc. have filed and received a single patent regarding smoke machine technology without Pieroni involved since he left in 2001;"

"Their common goal was to design a smoke machine around the shortcomings of old glow plug technology to create the smallest, fastest, simplest, safest, and most profitable smoke machine ever made."

1   These Statements mischaracterize the Star Products to give the false impression that

2   the Star Products are unsafe and/or are comparatively less safe than products that do

3   not use glow plugs.

4        28.   Defendants have also made false and disparaging Statements to

5   representatives of at least one major automotive manufacturer, including false and

6   misleading statements that: Star Products use nitrogen because of their [poor] glow

7   plug design; Star Products are less safe than competing products that do not use a

8   glow plug design; competing products using shop air are as safe or safer than the

9   Star Products; using competing products with shop air does not raise safety

10  concerns; the operating temperature of the glow plug in the Star Products is unsafe

11  and comparatively higher than the heating elements used in competing products; and

12  the dye that can be used in Star Products can damage vehicle systems. These

13  Statements mischaracterize the Star Products to give the false impression that the

14  Star Products are unsafe and/or are comparatively less safe than products that do not

15  use glow plugs.

### COUNT I

### Infringement of the '808 Patent Under 35 U.S.C. § 271 *et seq.*

### (Against All Defendants)

19       29.   Plaintiff restates and re-alleges each and every allegation set forth in

20  paragraphs 1 through 28 as though fully set forth herein, and incorporates them by

21  reference herein.

22       30.   Plaintiff, Star has acquired and continues to maintain the right to sue

23  upon the '808 Patent and the right to recover for infringement thereof.

24       31.   Defendants have infringed, induced infringement of, and/or

25  contributorily infringed the '808 Patent (either literally or under the doctrine of

26  equivalents), and are still doing so by making, using, importing, distributing, selling

27  and/or offering for sale products, including the Infringing Products, embodying the

28  patented inventions, and will continue to do so unless enjoined by this Court.

32. Defendants' acts of infringement are without permission, license, or consent of Star and, if allowed to continue, will cause irreparable injury to Star.

33. Defendants' acts of patent infringement interfere with Star's sales to and relationships with, potential and existing customers of its products. Such acts have caused and will continue to cause irreparable harm to Star's business and cause the value of the '808 Patent to diminish in value, for which Star has no adequate remedy at law.

34. Defendants are liable to Star for damages for patent infringement according to proof at trial.

35. Defendants' infringement is, knowing, willful and deliberate, and therefore this case should be deemed exceptional.

36. Defendants have been unjustly enriched and Star is entitled to an accounting and award of damages, interest, attorney's fees and costs.

## COUNT II

### False Representations/Product Disparagement Under 15 U.S.C. §1125 (a)

### (Against All Defendants)

37. Plaintiff restates and re-alleges each and every allegation set forth in paragraphs 1 through 28 as though fully set forth herein, and incorporates them by reference herein.

38. Defendants have made false and deceptive representations of fact in interstate commerce through Statements and representations, including those on the Websites and to representatives of major automotive manufacturers, about the nature, characteristics, and quality of the Star Products.

39. Each of Defendants' Statements constitutes a false, misleading and disparaging representation concerning the Star Products.

40. Star is informed and believes, and on that basis alleges, that Defendants have actual knowledge that their Statements and representations were false and misleading. Nevertheless, Defendants continue to make these Statements and

representations with the intent to deceive consumers, and lure business away from Star to competitors with whom Defendants are affiliated.

41.   Star is informed and believes, and on that basis alleges, that a significant portion of the intended audience has been deceived or is likely to be deceived by Defendants' false and misleading representations.

42.   Star is informed and believes, and on that basis alleges, that Defendants' false and misleading representations are material in that they are likely to influence the purchasing decisions of customers.

43.   As a result of Defendants' false and misleading representations about the Star Products, Defendants have created a likelihood of injury to Star's business, through at least likely diversion of sales from Star to competitors with whom Defendants are affiliated, and lessening of goodwill associated with Star's trademarks and its products sold in connection with these trademarks, and has otherwise competed unfairly with Star.

44.   Star is informed and believes, and on that basis alleges, that Defendants' acts complained of herein have caused damage in an amount to be determined at trial and caused irreparable injury to Star. These acts will result in further damage and irreparable injury if Defendant is not restrained by this Court from further violation of Star's rights, for which Star has no adequate remedy at law.

## COUNT III

### <u>Unfair Competition Under Calif. Bus. & Prof. Code § 17200</u>

### <u>(Against All Defendants)</u>

45.   Plaintiff restates and re-alleges each and every allegation set forth in paragraphs 1 through 28 as though fully set forth herein, and incorporates them by reference herein.

46.   By virtue of the previously described acts, Defendants have intentionally competed unfairly with Star in violation of California Business and

Professions Code § 17200 et seq. in that such acts were, and continue to be, unlawful, unfair, and fraudulent.

47.   By virtue of the previously described acts, Defendants have also intentionally competed unfairly with Star in violation of California Business and Professions Code § 17200 et seq. in that Defendants' false and disparaging Statements and representations about the Star Products were, and continue to be, unfair, deceptive, untrue and misleading.

48.   The acts described herein are unlawful in that they violate at least Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), California Business and Professions Code § 17500 et seq., and California common law.

49.   The acts described herein are fraudulent at least in that Defendants intentionally made knowingly false, misleading disparaging, and defamatory Statements about the Star Products that were material to consumers' purchasing decisions for the purpose of deceiving consumers and as a result customers are likely to be deceived or have been deceived as to the nature, characteristics, and quality of the Star Products to the detriment of consumers.

50.   Star has suffered injury, including a loss of money or property and damages to Star's reputation, goodwill, and the functioning of its business, as well as the lessening of goodwill associated with its trademarks and its products sold in connection with these marks, as a result of Defendants' false and disparaging Statements and representations about the Star Products.

51.   Star has been further injured in fact and has lost money, through having to expend time and money to correct the misrepresentations made by Defendants about the Star Products.

52.   By virtue of the previously described acts, Defendants have caused damage and irreparable injury to Star in an amount to be determined at trial.  These acts will result in further damage and irreparable injury if Defendants are not

1 restrained from further violation of Star's rights, for which Star has no adequate

2 remedy at law.

3       53.    Star is informed and believes, and on that basis alleges, that at all times

4 herein mentioned, Defendants knew that their Statements and representations were

5 false and misleading, disparaging, and defamatory and that Defendants nevertheless

6 continued to make these Statements and representations with the knowledge or

7 intent that such conduct would damage and cause injury to Star.

8       54.    Defendants' willful acts in violation of California Business and

9 Professions Code § 17200 et seq. constitute fraud, oppression and malice.

10 Accordingly, Star should recover all appropriate and necessary relief.

11 **PRAYER FOR RELIEF**

12    **WHEREFORE**, Plaintiff respectfully prays for judgment as follows:

13      A.    That Defendants infringed United States Patent No. 6,526,808.

14      B.    That Defendants' false, misleading and disparaging Statements and

15 representations as to the nature, characteristics and quality of the Star Products

16 constitute product disparagement and unfair competition under 15 U.S.C. § 1125(a).

17      C.    That Defendants' false, misleading and disparaging Statements and

18 representations as to the nature, characteristics and quality of the Star Products

19 constitute unfair competition under California Business and Professions Code §

20 17200 et seq.

21      D.    A preliminary and permanent injunction barring Defendants and those

22 in active concert with Defendants who receive actual notice of the injunction from

23 infringing, contributing to the infringement of, and inducing infringement of the

24 '808 Patent, and specifically from directly or indirectly making, using, selling, or

25 offering for sale, any products or services embodying the inventions of the '808

26 Patent during the life of the claims of the '808 Patent, without the express written

27 authority of Plaintiff.

28      E.    A preliminary and permanent injunction barring Defendants and those

1  in active concert with Defendants who receive actual notice of the injunction from

2  disseminating in any manner any false, misleading, disparaging, or defamatory

3  Statements concerning Star and the Star Products, or otherwise competing unfairly

4  with Star.

5       F.    A preliminary and permanent injunction requiring Defendants and

6  those in active concert with Defendants who receive actual notice of the injunction

7  to disseminate a full and complete retraction of, and corrective publication

8  regarding, all false, misleading, disparaging, or defamatory Statements concerning

9  Star and the Star Products.

10       G.    That Defendants be ordered to pay Star all damages that Star has

11  sustained as a result of the acts complained of herein, subject to proof at trial.

12       H.    That Star be awarded restitution of any benefits, revenue, profit or other

13  unjust enrichment derived by Defendants by reason of Defendants' acts complained

14  of herein.

15       I.    That Defendants' acts complained of herein be deemed willful and that

16  this case be deemed an exceptional case pursuant to 15 U.S.C. § 1117(a), and further

17  that Star be entitled to treble damages pursuant to 15 U.S.C. § 1117(a); and that Star

18  be awarded its costs, attorneys' fees and expenses in this suit, including pursuant to

19  15 U.S.C. § 1118.

20       J.    That Star be awarded all damages attributable to Defendants'

21  infringement of the '808 Patent pursuant to 35 U.S.C. § 284, and in an amount

22  according to proof at trial; that Defendants' conduct is deemed to be willful, and that

23  damages be trebled; that Star be awarded prejudgment and post judgment interest

24  pursuant to 35 U.S.C. § 284; and that this case is deemed to be exceptional, and

25  award reasonable attorney's fees and costs incurred in this action to Star.

26       K.    That Star be awarded exemplary damages from Defendants pursuant to

27  California Civil Code § 3294.

28       L.    That Star be awarded such other and further relief that the Court may

deem just and proper.

Dated:  October 25, 2012

Respectfully submitted,

TODD M. MALYNN
State Bar No. 181595
Email: tmalynn@feldmangale.com
**FELDMAN GALE, P.A.**
*Attorneys for Plaintiff*
880 West First Street, Suite 315
Los Angeles, California 90012
Telephone:  (213) 625-5992
Facsimile:  (213) 625-5993

## DEMAND FOR JURY TRIAL

Pursuant to Rule 28 of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury on all issues for which a trial by jury may be had.

Dated:  October 25, 2012

Respectfully submitted,

TODD M. MALYNN
State Bar No. 181595
Email: tmalynn@feldmangale.com
**FELDMAN GALE, P.A.**
*Attorneys for Plaintiff*
880 West First Street, Suite 315
Los Angeles, California 90012
Telephone:  (213) 625-5992
Facsimile:  (213) 625-5993

US006526808B1

(12) **United States Patent**
Pieroni et al.

(10) Patent No.: **US 6,526,808 B1**
(45) Date of Patent: **Mar. 4, 2003**

(54) SMOKE AND CLEAN AIR GENERATING MACHINE FOR DETECTING PRESENCE AND LOCATION OF LEAKS IN A FLUID SYSTEM

(75) Inventors: **Kenneth Alan Pieroni**, Fullerton, CA (US); **Jim Eli Saffie**, Santa Monica, CA (US)

(73) Assignee: **Star EnviroTech, Inc.**, Costa Mesa, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/348,320**

(22) Filed: **Jul. 7, 1999**

(51) Int. Cl.7 .................................................. G01M 3/04
(52) U.S. Cl. .................................................... 73/40.7
(58) Field of Search ........................... 73/40.7; 239/128, 239/129

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 2,686,160 | A | * | 8/1954 | Kell et al. | 252/359 |
| 3,361,547 | A | * | 1/1968 | Packo | 48/193 |
| 3,406,017 | A | * | 10/1968 | Canning | 23/232 |
| 3,483,735 | A | * | 12/1969 | Packo | 73/40.7 |
| 3,887,716 | A | * | 6/1975 | Seelbach | 426/231 |
| 4,155,249 | A | * | 5/1979 | Scott | 73/40.7 |
| 4,330,428 | A | * | 5/1982 | Clifford | 252/359 |
| 4,594,251 | A | * | 6/1986 | Nicholson | 426/262 |
| 4,754,638 | A | * | 7/1988 | Brayman et al. | 73/40.7 |
| 4,773,255 | A | * | 9/1988 | Malcosky et al. | 73/40.7 |
| 4,883,676 | A | * | 11/1989 | Sophianopoulos et al. | 426/314 |

| | | | | | |
|---|---|---|---|---|---|
| 5,107,698 | A | * | 4/1992 | Gilliam | 73/40.7 |
| 5,849,596 | A | * | 12/1998 | Chu et al. | 436/168 |
| 5,859,363 | A | * | 1/1999 | Gouge | 73/40.7 |
| 5,922,944 | A | * | 7/1999 | Pieroni et al. | 73/40.7 |
| 6,142,009 | A | * | 11/2000 | Loblick | 73/40.7 |
| 6,181,874 | B1 | * | 1/2001 | Ireland et al. | 392/497 |
| 6,233,908 | B1 | * | 5/2001 | Rink et al. | 53/440 |

OTHER PUBLICATIONS

Gilles et al., Feb. 22, 2000, ATI TDA 5A Aerosol Generator Evaluation, 25th DOE/RNC Nuclear Air Cleaning and Treatment Conference, pp. 90–97, especially p. 90.*

* cited by examiner

*Primary Examiner*—Daniel S. Larkin
*Assistant Examiner*—Charles D Garber
(74) *Attorney, Agent, or Firm*—Morland C. Fischer

(57) **ABSTRACT**

A smoke and clean air generating machine for detecting the presence and location of leaks in a fluid system (e.g. the evaporative or brake system of a motor vehicle). A source of gas (e.g. air or nitrogen) under pressure is delivered to a smoke generating apparatus or to a flow meter by way of a multi-position selector valve. With the selector valve in a first position, gas is delivered to the system under test via the flowmeter to detect the presence of a leak in need of repair depending upon the reading of the flow meter. With the selector valve in a second position, gas is delivered to the smoke generating apparatus so that smoke can be supplied to the system under test to locate the leak. With the selector valve in a third position between the first and second positions, pressure is bled from the machine to disable the smoke generating apparatus and thereby terminate the production of smoke.

**9 Claims, 4 Drawing Sheets**



**EXHIBIT A**



FIG. 1



Fig. 2



Fig. 3



Fig. 4

US 6,526,808 B1

1

# SMOKE AND CLEAN AIR GENERATING MACHINE FOR DETECTING PRESENCE AND LOCATION OF LEAKS IN A FLUID SYSTEM

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to a compact, easy to use and portable smoke and clean air generating machine that enables the presence and location of leaks in a fluid system (e.g. the evaporative or brake system of a motor vehicle) to be accurately and visually detected depending upon the rate of air flow through the fluid system under test and whether smoke escapes from the system.

### 2. Background Art

Our patent application Ser. No. 09/020,841 filed Feb. 9, 1998 and entitled SMOKE PRODUCING APPARATUS FOR DETECTING LEAKS IN A FLUID SYSTEM discloses an efficient, portable apparatus for generating smoke in order to locate leaks in a fluid system (e.g. air, oil, fuel, exhaust, etc.) system. A supply of oil within a sealed chamber is vaporized, and the resulting smoke is delivered to the system under test. By visually inspecting the system for smoke escaping therefrom, the precise location of a leak in the system can be accurately detected.

With the growing emphasis being placed on reducing the volume of emissions leaking into the atmosphere, it has become increasingly important to be able to monitor and test the integrity of a fuel vapor recovery or evaporative system in today's motor vehicles. By way of example, to test for leaks, the evaporative system of a motor vehicle is typically pressurized for a predetermined time. If the pressure holds throughout the time interval, then the integrity of the system is presumed to be intact.

The problem is that this conventional method of testing for leaks in the vapor recovery system of a motor vehicle does not take into account the volume of fuel stored in the gas tank. That is to say, the smaller the volume of fuel stored in the gas tank, the greater will be the empty space within the tank lying above the fuel supply. Such empty space acts as air and pressure accumulator. More particularly, for a vehicle with less fuel and a larger air space in its tank, it will take a longer time to detect a leak. Therefore, the test operator can receive a false indication as to the integrity of the evaporative system, because of the increased time that is required for this system having an air accumulator to be fully pressurized. Consequently, an evaporative system which shows that it is holding pressure over time may actually have a leak and be in need of repair to avoid emissions to the atmosphere.

Accordingly, it is desirable to be able to overcome the aforementioned problems associated with the conventional method of testing for leaks in a fluid system so that the existence and location of a leak may be accurately verified and detected. To this end, it would also be desirable to achieve this goal by using the efficient smoke generating apparatus that is described in our above-entitled patent application.

## SUMMARY OF THE INVENTION

Briefly, and in general terms, a smoke and clean air generating machine is disclosed that is adapted to produce either a supply of clean air or a supply of smoke to a fluid system (e.g. the evaporative or brake system of a motor

2

vehicle) to be tested for leaks. An air compressor provides a supply of air under pressure. The air compressor is connected to supply air to a smoke generating apparatus or to a flow meter by means of a two-way bleed off selector valve. More particularly, with the selector valve rotated to a clean air position, the air compressor will communicate with the flow meter which measures the rate of air being delivered to the system under test. With the selector valve rotated to a smoke position, the air compressor will be connected to the smoke generating apparatus so that a supply of oil in a sealed chamber can be blown towards and vaporized by a heating grid and the resulting smoke delivered to the system under test. However, when the selector valve passes through a center position between its smoke position and clean air position, any pressure that has been developed in the air line between the air compressor and the smoke generating apparatus will be exhausted (i.e. bled off) to the atmosphere so as to automatically de-energize the heating grid of the smoke generating apparatus and thereby insure that the heating grid will cool and no additional smoke will be generated.

In operation, the selector valve is first rotated to its clean air position, whereby a supply of clean (i.e. non-smoky) air is delivered from the air compressor to the system under test via the flow meter. An air accumulator having an integral check valve to relieve excess pressure is located between the selector valve and the flow meter to smooth any pulsations in the flow of air to the meter. The existence of a leak having sufficient size to require repair is indicated in the event that the flow meter reads a rate of air flow from the air compressor to the system under test which is greater than a predetermined flow rate that is characteristic of a leak free system. Should a leak be indicated, the selector valve is then rotated to its smoke position, whereby a supply of air is delivered from the air compressor to the smoke generating apparatus. The smoke generating apparatus generates a supply of smoke via a smoke outlet line thereof to the fluid system under test. By visually inspecting the system under test for any escaping smoke, the precise location of a leak can be determined. Coupled to the smoke outlet line of the smoke generating apparatus is a pressure discharge accumulator having an integral check valve that is adapted to open to relieve excess pressure. In the event of a pressure build-up in the smoke outlet line (such as when the system to be tested is partially or completely restricted), the smoke is diverted to the check valve. As the exiting smoke begins to cool and condense, droplets of oil will be collected within the pressure discharge accumulator. The excess pressure within the smoke outlet line will then be dissipated to the atmosphere through a small orifice in the accumulator.

As an alternate embodiment of the present invention, the air compressor to deliver clean air to the flow meter and the smoke generating apparatus can be replaced by a pressure and flow regulated source of non-flammable nitrogen gas. In this case, a mixture of nitrogen (rather than air) and smoke will travel through the smoke outlet line to be delivered to the system under test so that a relatively safe, non-explosive environment can be established, particularly in situations characterized by high temperatures.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a schematic of the smoke and clean air generating machine which forms the present invention for verifying the presence and detecting the location of leaks in a fluid system under test;

FIG. 2 shows a 2-way selector valve from the smoke and clean air generating machine of FIG. 1 rotated to a clean air

US 6,526,808 B1

3

position for connecting an air compressor to the fluid system under test by way of a flow meter;

FIG. 3 illustrates the selector valve of FIG. 2 rotated to a smoke position to connect the air compressor 25 to a smoke generating apparatus; and

FIG. 4 shows the selector valve rotated to a center position between the clean air and smoke positions of FIGS. 2 and 3 for discharging pressure through the selector valve to control the operation of the smoke generating apparatus.

## DETAILED DESCRIPTION

Referring to the drawings, there is shown in FIG. 1 a smoke and clean air generating machine having an outer casing (designated by phantom lines) 50 within which is housed a smoke generating apparatus 1 that is adapted to generate a supply of smoke to a smoke outlet line 2 and a smoke supply line 4 so that a fluid system (not shown) can be visually inspected for leaks. The smoke generating apparatus 1 has been described in detail in our earlier patent application Ser. No. 09/020,841 filed Feb. 9, 1998, the teachings of which are incorporated herein by reference. Therefore, a full description of the smoke generating apparatus 1 will not be provided.

Briefly, however, the smoke generating apparatus 1 includes a sealed chamber 6 which contains a non-toxic oil supply 8. An air inlet tube 10 projects upwardly from the bottom of chamber 6 and extends above the oil supply 8. Inlet tube 10 communicates with an external air compressor 25 through a wall of chamber 6. An inlet orifice 12 is formed in the air inlet tube 10 so as to lie within the oil supply 8 immediately above the bottom of chamber 6. A resistor heating grid (e.g. coil) 14 extends laterally across the sealed chamber 6 and is electrically connected to a 12 volt battery 16 by means of an electric pressure switch 36. A fluid baffle 18 having a smoke outlet orifice 20 formed therein extends laterally across the sealed chamber 6 above the heating grid 14. The aforementioned smoke outlet line 2 communicates with the outlet orifice 20 through the top wall of the sealed chamber 6.

In operation, when the pressure switch 36 is closed, the battery 16 supplies current to heat the heating grid 14, and the air compressor 25 delivers air into the sealed chamber 6 via air inlet tube 10 at approximately 14 liters/minute to cause some of the oil supply 8 within the chamber to be drawn, by means of suction through inlet orifice 12 and into the air inlet tube 10. A mixture of air and oil is then blown upwardly and outwardly from the air inlet tube 10 towards and into contact with the heating grid 18, whereby the oil is instantaneously vaporized into smoke. The rising smoke travels through the outlet orifice 20 in fluid baffle 18 for receipt by the smoke outlet line 2. Accordingly, the smoke in outlet line 2 is carried by way of the smoke supply line 4 to the fluid system to be tested so that the integrity of the system may be visually inspected for leaks depending upon the absence or presence of smoke escaping therefrom.

In accordance with the present improvement, a two-way never closing bleed-off selector valve 30 is provided to control the flow of air from the compressor 25 to either the smoke generating apparatus 1, when it is desirable to generate smoke to be delivered to the system to be tested for leaks, or to a flow meter 32, when it is desirable to supply clean (i.e. non-smoky) air to the system to be tested. The selector valve 30 is rotated to a clean air position to connect the air compressor 25 to the flow meter 32, whereby clean air will by-pass the smoke generating apparatus 1 for receipt by the system to be tested via the smoke supply line 4 when

4

it is desirable to verify the existence and size of a potential leak in the system. Since smoke carries oil and particulate matter, it is not desirable for smoke to pass through the flow meter 32. Such smoke can cause the flow meter 32 to malfunction and eventually fail.

The selector valve 30 is rotated to a smoke position to cause the air compressor 25 to communicate directly with the smoke generating apparatus 1, whereby smoke can be generated to identify the specific location of a leak in the system to be tested. As will be described in greater detail hereinafter when referring to FIGS. 2–4, the selector valve 30 is also rotated to a center position (i.e. during the transition between the smoke and clean air positions) when it is desirable to bleed-off pressure that has been developed in the smoke outlet line 2 by the air compressor 25.

With the selector valve 30 rotated to the smoke position to connect the air compressor 25 to the smoke generating apparatus 1, air, under pressure, will be supplied to the air inlet tube 10 inside the sealed chamber 6 by way of a seven pound cracking pressure check valve 34. Pressure check valve 34 performs two different functions. In one case, the pressure check valve 34 functions as a conventional one-way check valve to block the reverse flow of oil from the smoke generating apparatus 1 to the selector valve 30. In addition, check valve 34 also prevents the backflow of oil from chamber 6 should the casing 50 be accidentally tipped. In a second case, the pressure check valve 34 establishes a back pressure in the air supply line between check valve 34 and air compressor 25. Such back pressure is required to activate the aforementioned electric pressure switch 36 which is connected to the battery 16 and which must be closed before current will be supplied from battery 16 to the heating grid 14 within the chamber 6 of smoke generating apparatus 1.

The electric pressure switch 36 is a conventional, normally open pressure activated contact switch. When the selector valve 30 is rotated to its smoke position, the normally open electric pressure switch 36 will be closed in response to the pressure that is established in the line between check valve 34 and air compressor 25. Once switch 36 is closed, a current path will be created between the battery 16 and the heating grid 14 of smoke generating apparatus 1 so that the droplets of oil that are blown towards heating grid 14 from oil supply 8 will be vaporized into smoke within chamber 6. However, as an important feature of this invention, when the selector valve 30 is rotated from its smoke position so as to move through the center position thereof (best described when referring to FIG. 4), an air path will be created through selector valve 30 by which to relieve the back pressure that was previously established behind check valve 34. In particular, such back pressure will be discharged through selector valve 30 to the air compressor 25 or to a soon to be described air accumulator 42. Hence, the electric pressure switch 36 will be responsive to such pressure loss, whereby to automatically return to its normally open switch condition and thereby break the current path between the battery 16 and the heating grid 14 of smoke generating apparatus 1. Accordingly, the heating grid 14 will cool and the generation of smoke will cease.

As another important feature of this invention, the smoke outlet line 2 from the sealed chamber 6 of smoke generating apparatus 1 is coupled to a pressure discharge pressure check valve 40 through a one pound cracking pressure check valve 40. As shown, the pressure check valve 40 is positioned upstream and between the smoke generating apparatus 1 and the system to be tested so as to be responsive to the output pressure of the smoke that is carried by the smoke outlet line

US 6,526,808 B1

5

2 after selector valve 30 has been rotated to its smoke position. By virtue of the foregoing, when the smoke supply line 4 or the fluid system to be tested is partially or fully restricted, the pressure check valve 40 will open, whereby smoke and/or pressure that builds up within the smoke supply line 4 will be able to escape to the atmosphere through an orifice in the pressure discharge accumulator 38. At the same time, the open pressure check valve 40 will allow air (including any oil products that are carried therein) to continue to circulate through the chamber 6 of smoke generating apparatus 1 in order to produce smoke therewithin. Such continued circulation will advantageously prevent the heating grid 14 of smoke generating apparatus 1 from overheating at times when the system to be tested is blocked and smoke within the outlet line 2 would otherwise be trapped.

Locating the pressure check valve 40 after the smoke producing apparatus 1, rather than prior to the air inlet tube 10 of chamber 6 (e.g. between inlet tube 10 and pressure check valve 34), avoids an early release of some or all of the pressure which would reduce or eliminate the air and oil circulation process that is otherwise achieved in the manner described above by coupling the smoke outlet line from chamber 6 to the pressure check valve 40. Thus, with the present improvement, it will still be possible to generate smoke so as to locate any leaks in the fluid system to be tested even during situations where the fluid system and/or the smoke supply line 4 is partially or completely restricted.

Locating the combination of pressure discharge accumulator 38 and pressure check valve 40 upstream from the smoke generating apparatus 1 will permit any oil products that have been vaporized by the heating grid 14 and carried through an open check valve 40 to condense and collect within the accumulator 38 during less than full flow conditions in the smoke outlet line 2. Such condensation reduces the amount of unwanted oil that would otherwise be released into the environment from the pressure discharge accumulator 38 under abnormally high pressure conditions within the smoke outlet line 2 when the pressure check valve 40 is open. In other words, accumulator 38 collects the residue after the oil supply 8 from sealed container 6 is first vaporized by heating grid 14 into smoke and then condensed back into oil following contact with check valve 40. Without accumulator 38 to collect the oil carried by the smoke, the smoke could build up on the outlet side of the pressure check valve 40 and eventually spill out each time that the check valve 40 would open to release pressure. Such oil spillage could be undesirably encountered at the exterior of the casing 50 in which the smoke generating apparatus 1, selector valve 30 and pressure check valve 40 are all housed and transported from place to place.

At such time when the selector valve 30 is rotated to its clean air position (when no smoke is being generated by apparatus 1), an air path is established between compressor 25 and a pre-meter air accumulator 42. Air accumulator 42 is preferably a hollow chamber or air damper that functions to reduce or dampen the fluctuation to which flow meter 32 would be subjected that might alter the reading of flow meter 32 as a consequence of the pulsations that are common to a piston-type air compressor, such as that which has been shown and described herein, and the opening and closing of a soon to be described check valve 44. In this same regard, it would be possible to eliminate the air accumulator 42 altogether if the air compressor 25 were replaced by a non-pulsating air pump. However, a pulsating piston-type air compressor 25 is preferable because it is known to be reliable and readily available for use in the present invention.

6

A one-half pound check valve 44 is coupled to the air accumulator 42. Check valve 44 functions to relieve excess pressure within the clean air supply line 46 when clean air is supplied via flow meter 32 and the system to be tested or the smoke supply line 4 is partially or fully restricted. It is important that the check valve 44 be positioned behind (i.e. downstream from) the flow meter 32. During clean air operation, with selector valve 30 rotated to its clean air position, if check valve 44 were located ahead of (i.e. upstream from) flow meter 32, then the flow meter 32 would continue to meter clean air passing therethrough even if the system to be tested or the smoke supply line 4 were blocked.

Connected in the clean air supply line 46 which runs from flow meter 32 to smoke supply line 4 is a directional check valve 48. Check valve 48 limits the flow of clean air from air compressor 25 to a single direction away from flow meter 32 so that smoke produced by smoke generating apparatus 1 will be unable to pass through the clean air supply line 46 to contaminate the flow meter 32 and loose pressure through check valve 44 which would undesirably reduce the efficiency of operation.

On the other hand, to maximize the efficiency of the smoke and clean air generating machine of this invention, it is important that the check valve 44 on the clean air side have a lower cracking or threshold pressure (e.g. one-half pound) than the cracking pressure (e.g. one pound) of the check valve 40 on the smoke side. As previously described, if the system to be tested or the smoke supply line 4 were partially or completely restricted after selector valve 30 is rotated to its clean air position, any excess pressure that is built up in the clean air supply line 46 would escape through check valve 44 of air accumulator 42. However, if the cracking pressure of check valve 40 were less than the cracking pressure of check valve 44, then flow meter 32 will continue to meter air flow therethrough even during such high pressure conditions. By virtue of the present improvement, if the system to be tested or the smoke supply line 4 were blocked when the selector valve 30 is rotated to it smoke position, then the smoke generated by apparatus 1 will escape through check valve 40, since the directional check valve 48 will not allow the back flow of smoke through the clean air supply line 46 and towards flow meter 32.

Although the smoke generating apparatus 1 has been described above as receiving air under pressure from an air compressor 25, it is to be understood that gases other than air may be supplied to the air inlet tube 10 of apparatus 1 to cause a mixture of such gas and oil to be blown towards the heating grid 14. More particularly, testing the integrity of the evaporative system in a motor vehicle is now required by the Environmental Protection Agency in many states. It has become essential to be able to verify if the evaporative system has a leak and then identify the location of the leak. As an alternative to pressurized air, carbon dioxide or nitrogen gas from a pressure and flow regulated tank or bottle 60 can be used because of their non-flammable and inert characteristics. That is to say, smoke carried by nitrogen gas would be relatively safe for testing the evaporative system of a motor vehicle which lies in a generally volatile environment of potentially explosive hydrocarbon vapors. Accordingly, the ability to produce smoke with nitrogen gas would provide a safe and efficient means for locating a leak in the evaporative system of a motor vehicle. Moreover, producing smoke with nitrogen gas rather than air would enable a variety of high pressure systems (e.g. an air brake system) to be tested at high operating temperatures but without the inherent risks of an explosion.

US 6,526,808 B1

7

8

What is even more, other sources of air under pressure, other than air compressor 25, may be employed to blow the oil towards the heating grid 14. For example, conventional shop air such as that used by an automotive repair facility may be substituted for compressor 25.

The advantage provided by the smoke and clean air generating machine of this invention is not only the ability to indicate the precise location of a leak (when selector switch 30 is rotated to the smoke position), but also to first verify whether the system to be tested has a leak in need of repair (when selector switch 30 is rotated to the clean air position). More particularly, the flow meter 32 that is connected in the clean air supply line 46 is a non-regulating flow meter that has a ball indicator to provide a visual reading when the system to be tested has a leak that is of sufficient size to warrant repair. Flow meter 32 is first initialized to a flow rate setting that corresponds to a leak size in the fluid system of 1 millimeter in diameter, a size which is generally considered in the industry to represent the standard tolerance level of a fluid system before the repair of a leak is required. Of course, the initial setting of flow meter 32 could change in the event that the tolerance standards of fluid systems subjected to leaks also change.

Once the selector valve 30 is rotated to its clean air position to connect air compressor 25 to flow meter 32, should the fluid system have a leak size which is in tolerance (i.e. less than 1 millimeter) then the reading of flow meter 32 will be at or below the initialized flow rate, and no repair will be necessary. However, should the fluid system have a leak, the size of which is larger than 1 millimeter, then the reading of flow meter 32 will be above the initialized flow rate, such that the leak must be located and repaired. At this point, the selector valve 30 is rotated from its clean air position to its smoke position, whereby a supply of smoke is delivered from the sealed chamber 6 of smoke generating apparatus 1 to the system to be tested in the manner described above.

Turning now to FIGS. 2-4 of the drawings, details of the 2-way-bleed-off selector valve 30 are now provided. FIG. 2 shows the selector valve 30 having a manually-controlled knob 50 rotated to the clean air position in order to connect the air compressor 25 to the clean air side of the smoke and clean air generating machine of this invention so that a supply of clean air will be delivered to the system under test via the flow meter 32 in order to verify the presence of a leak having sufficient size to warrant repair. In this same regard, the air compressor 25 is disconnected from the smoke generating apparatus 1.

FIG. 3 shows the knob 52 of selector valve 30 rotated 180 degrees from the clean air position of FIG. 2 to the smoke position to connect the air compressors 25 to the smoke side of the smoke and clean air generating machine so that a supply of air will be delivered to the smoke generating apparatus 1. Smoke generated from the sealed chamber 6 of apparatus 1 is supplied to the system under test via smoke outlet line 2 in order to detect the precise location of a leak in need of repair depending upon a visual observation of smoke escaping through the leak. In this same regard, the air compressor 25 is disconnected from the flow meter 32.

FIG. 4 shows the knob 52 of selector valve 30 momentarily rotated through a center or neutral position during the transition of knob 52 from the smoke position of FIG. 3 to the clean air position of FIG. 2. In this case, an air path is established through selector valve 30 from the check valve 34 to the air compressor 25 and/or the air accumulator 42 in order to bleed off air pressure from pressure switch 36. As previously described, pressure switch 36 is responsive to

such pressure loss and will return to its normally closed condition, whereby to disconnect the battery 16 from the heating grid 14 of smoke generating apparatus 1 so as to allow the heating grid to safely cool and thereby terminate the generation of smoke.

It may be appreciated that in a conventional selector valve, the center position thereof would typically allow no air to flow in either direction through the valve. However, selector valve 30 of the present invention is a never closing valve such that in its center position, the smoke side of the smoke and clean air generating machine is momentarily placed into communication with the clean air side whereby air pressure will be bled from the smoke side to cause a drop in pressure so that heating grid 14 will cool and no smoke will be generated. As described above, such bleeding off of the air pressure from the smoke side occurs only when selector valve 30 is moved through its center or neutral position and, unlike conventional valves, permits the aforementioned communication between the smoke and clean air sides to disconnect heating grid 14 from battery 16.

We claim:

1. A method for generating smoke for use at a volatile, potentially explosive environment, comprising the steps of:
locating a supply of flammable fluid within a closed smoke producing chamber, said closed smoke producing chamber having a gas inlet to receive a supply of non-combustible nitrogen gas under pressure and a smoke outlet to permit smoke to exit said closed smoke producing chamber;

locating a heating element within said closed smoke producing chamber so as to extend in spaced alignment with said supply of fluid;

supplying said non-combustible nitrogen gas under pressure to said closed smoke producing chamber via said gas inlet for blowing a mixture of said non-combustible nitrogen gas and said supply of flammable fluid against said heating element;

energizing said heating element for vaporizing into smoke said mixture of non-combustible nitrogen gas and said flammable fluid that is blown against said heating element, said non-combustible nitrogen gas preventing dieseling within said closed chamber and the possibility of an explosion at the volatile, potentially explosive environment at which the smoke will be used; and

removing said smoke from said smoke producing chamber to the volatile potentially explosive environment via said smoke outlet.

2. The method recited in claim 1, wherein said gas inlet includes a tube that runs through and extends above said supply of fluid within said smoke producing chamber, said gas inlet tube having an inlet orifice located within said supply of fluid so that when said non-combustible nitrogen gas under pressure is delivered through said gas inlet tube, some of said supply of fluid is drawn into said gas inlet tube via said inlet orifice thereof to create said mixture to be blown against and vaporized by said heating element.

3. The method recited in claim 1, including the additional step of monitoring the pressure within said smoke outlet of said smoke producing chamber and discharging said pressure to the atmosphere when said pressure exceeds a predetermined pressure level.

4. The method recited in claim 3, including the additional step of locating a pressure discharge accumulator between said smoke outlet and the atmosphere, such that when the pressure in said smoke outlet is discharged to the atmosphere, the smoke within said smoke outlet will be

US 6,526,808 B1

9

condensed into droplets of said fluid supply and collected within said pressure discharge accumulator.

5. The method recited in claim 1, including the additional steps of monitoring the pressure of said non-combustible nitrogen gas being supplied under pressure to said smoke producing chamber via said gas inlet, energizing said heating element when the pressure of the nitrogen gas in said gas inlet is above a predetermined pressure and de-energizing said heating element when the pressure of the nitrogen gas in said gas inlet is below said predetermined pressure.

6. A method for generating smoke for use at a volatile, potentially explosive environment, said method comprising the steps of:

locating a supply of flammable fluid within a smoke producing chamber, said smoke producing chamber having a gas inlet to receive a non-combustible gas under pressure;

supplying said non-combustible gas under pressure to said smoke producing chamber via said gas inlet for blowing a mixture of said non-combustible gas and said supply of flammable fluid against a heating element and for creating an inert environment within said smoke producing chamber;

energizing said heating element for vaporizing into smoke said mixture of non-combustible gas and said flammable fluid that is blown against said heating element, said non-combustible gas preventing ignition and thereby avoiding the possibility of an explosion at the volatile, potentially explosive environment at which the smoke will be used; and

10

delivering the smoke produced by said heating element to the volatile potentially explosive environment.

7. The method recited in claim 6, wherein said non-combustible gas is nitrogen gas.

8. The method recited in claim 6, wherein said non-combustible gas is carbon dioxide gas.

9. A method for generating smoke for use at a volatile, potentially explosive environment, said method comprising the steps of:

locating a heating element within a closed smoke producing chamber, said smoke producing chamber having a gas inlet and a smoke outlet;

delivering a flammable fluid to said heating element within the closed smoke producing chamber;

energizing said heating element for vaporizing into smoke the flammable fluid that is delivered thereto; and

blowing a supply of non-combustible gas under pressure into the closed smoke producing chamber by way of said gas inlet thereof for (1) creating an inert environment within said chamber so as to prevent ignition and thereby avoid the possibility of an explosion when said flammable fluid is vaporized into smoke by said heating element and (2) for carrying the smoke to the volatile potentially hazardous environment by way of the smoke outlet of the closed smoke producing chamber.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

Page 1 of 1

PATENT NO.          : 6,526,808 C1
APPLICATION NO.   : 90/009683
DATED                  : March 4, 2003
INVENTOR(S)         : Pieroni et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page, (Item 75) Inventors, Line 7, after "Jim", delete "El Saffie" and insert --Eli Saffie--.

Signed and Sealed this
Fifteenth Day of November, 2011

David J. Kappos
Director of the United States Patent and Trademark Office

US006526808C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8410th)

# United States Patent

Pieroni et al.

(10) **Number:** US 6,526,808 C1

(45) **Certificate Issued:** Jul. 19, 2011

(54) **SMOKE AND CLEAN AIR GENERATING MACHINE FOR DETECTING PRESENCE AND LOCATION OF LEAKS IN A FLUID SYSTEM**

(75) Inventors: **Kenneth Alan Pieroni**, Fullerton, CA (US); **Jim El Saffie**, Santa Monica, CA (US)

(73) Assignee: **EnviroTech, Inc.**, Costa Mesa, CA (US)

Reexamination Request:
No. 90/009,683, Mar. 18, 2010

Reexamination Certificate for:
Patent No.: **6,526,808**
Issued: **Mar. 4, 2003**
Appl. No.: **09/348,320**
Filed: **Jul. 7, 1999**

(51) Int. Cl.
*G01M 3/04* (2006.01)

(52) U.S. Cl. ...................................... 73/40.7
(58) Field of Classification Search .................. 73/40.7
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,484,195 A | 11/1984 | Shaffer |
| 4,547,656 A | 10/1985 | Swiatosz et al. |
| 4,568,820 A | 2/1986 | Swiatosz |
| 4,732,085 A * | 3/1988 | Gershenson et al. |
| 4,968,365 A | 11/1990 | Krone |
| 4,998,479 A | 3/1991 | Perham et al. |
| 5,094,168 A | 3/1992 | Rumer |
| 5,122,298 A | 6/1992 | Fry, Jr. et al. |
| H1124 H | 1/1993 | Rouse et al. |
| 5,369,984 A | 12/1994 | Rogers et al. |
| 5,922,944 A | 7/1999 | Pieroni et al. |
| 6,087,935 A * | 7/2000 | Berner et al. |
| 2009/0298935 A1 | 12/2009 | Flanigan et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 1039729 | 8/1966 |
| GB | 1064234 | 4/1967 |
| GB | 1243381 | 8/1971 |

OTHER PUBLICATIONS

Ballou, Ph.D., "Chemical Characterization and toxicologic Evaluation of Airborne Mixtures", Batelle Memorial Institute, Apr. 1981, in 12 pages, Richland, Washington.

Goodale, Thomas, "Improvement of the Performance of Carbon Smoke Generators by the Choice of Fuels and Fuel Additives", URS Systems Corporation, Jul. 8, 1968, in 11 pages, Burlingame, California.

Nowakowski, Paul, "Luminescent Smoke Generation Feasibility Study", Missouri Research Laboratories, Inc. May 1968, in 29 pages, St. Louis Missouri.

Liss–Suter, Deborah, et al., "Occupational Health and Safety Aspects of the Fog Oils SGF No.1 and SGF No. 2 and Smoke Screens Generated from them", SISD, The Franklin Institute Research Laboratories, Apr. 1978, in 12 pages, Philadelphia, Pennsylvania.

Sinclair K., et al., "The Performance Testing of The E. 19r1 Mechanical Smoke Generator", Porton Technical Paper No. 336, Copy 83, Feb. 10, 1953, in 40 years.

(Continued)

*Primary Examiner*—Robert Nasser

(57) **ABSTRACT**

A smoke and clean air generating machine for detecting the presence and location of leaks in a fluid system (e.g. the evaporative or brake system of a motor vehicle). A source of gas (e.g. air or nitrogen) under pressure is delivered to a smoke generating apparatus or to a flow meter by way of a multi-position selector valve. With the selector valve in a first position, gas is delivered to the system under tests via the flowmeter to detect the presence of a leak in need of repair depending upon the reading of the flow meter. With the selector valve in a second position, gas is delivered to the smoke generating apparatus so that smoke can be supplied to the system under test to locate the leak. With the selector valve in a third position between the first and second positions, pressure is bled from the machine to disable the smoke generating apparatus and thereby terminate the production of smoke.



US 6,526,808 C1

Page 2

## OTHER PUBLICATIONS

Zaytsev, et al., "Smoke Agents and Devices and Smoke–Producing Substances" Jan. 21, 1970, in 22 pages.

Grandmaison, E W., et al., "A smoke generation system for fluid dynamics research" 1987, pp. 605–608, Great Britain.

Vogelgesang, et al., "Agglomeration of magnetic fine particles in fluid dispersion" Apr. 15, 1985, 4277–4279, J. Appl. Phys. 57 (1), American Institute of Physics, Pittsburgh, Pennsylvania.

"Improved Smoke Generator for Low–Speed Wind Tunnels" Nasa Tech Brief Langley Reseach Center, Sep. 1971, Washington D.C. in 1 page.

Kaito, et al., "Magnetic Field Effect on the Growth of Ultra Fine Ferromagnetic Metal Particles", Journal of Crystal Growth 79, 1986, pp. 132–139, Elsevier Science Publishers B.V., North Holland, Amsterdam.

Roschke, E.J., "Oil–Smoke Generator for Use at Elevated Pressures" The Review of Scientific Instruments, May 1967, vol. 38, No. 5, pp. 686–688, Pasadena California.

Kays, et al., "Qualitative Description of Obscuration Factors in Central Europe", Athmospheric Sciences Laboratory, Sep. 1980, in 22 pages, White Sands Missile Range, NM.

Edited by Elkins & Kohl, "Proceedings of the Smoke/Obscurants Symposium V" Apr. 1981, in 25pages, Tullahoma, Tennessee.

U.S. Appl. No. 90/011,545, filed Mar. 7, 2011, Pieroni, et al.

U.S. Appl. No. 90/011,544, filed Mar. 7, 2011, Bandyard, et al.

"EPA I/M Costs, Benefits, and Impacts," p. 5, dated Nov. 1992.

IM240 & EVAP Technical Guidance; United States Environmental Protection Agency, Air and Radiation; EPA420–R–98–010; Aug. 1998; 46 pages.

USPTO Office Action mailed Sep. 25, 2002; Application No. 09/348,320; filing date Jul. 7, 1999; First Named Inventor Kenneth Alan Pieroni; 8 pages.

* cited by examiner

US 6,526,808 C1

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claim 9 is determined to be patentable as amended.

New claim 10 is added and determined to be patentable.

Claims 1–8 were not reexamined.

9. A method for generating smoke for use at a volatile, potentially explosive environment, said method comprising the steps of:

locating a heating element within a closed smoke producing chamber, said smoke producing chamber having a gas inlet and a smoke outlet;

delivering a flammable fluid to said heating element within the closed smoke producing chamber;

energizing said heating element for vaporizing into smoke [and] *within the closed smoke producing chamber* the flammable fluid that is delivered thereto;

2

blowing a supply of non-combustible gas under pressure into the closed smoke producing chamber by way of said gas inlet thereof for (1) creating an inert environment within said chamber so as to prevent ignition and thereby avoid the possibility of an explosion when said flammable fluid is vaporized into smoke by said heating element and (2) for carrying the smoke to the volatile potentially [hazardous] *explosive* environment by way of the smoke outlet of the closed smoke producing chamber, *said volatile potentially explosive environment being a closed system undergoing testing for leaks; and*

*connecting the smoke outlet of said closed smoke producing chamber to the closed system undergoing testing, said supply of non-combustible gas for creating an inert environment within the closed system to which the smoke is carried, said inert environment with the closed system preventing ignition within the closed system during the testing thereof;*

*wherein the closed system to be tested for leaks at the volatile, potentially explosive environment is the evaporative system of a motor vehicle including a fuel tank, further comprising delivering smoke from the smoke outlet of said smoke producing chamber to the fuel tank.*

*10. The method for generating smoke recited by claim 9, comprising the additional step of regulating the pressure at which the smoke is carried by said non-combustible gas from said closed smoke producing chamber to the closed system undergoing testing.*

* * * * *

US006526808C2

# (12) EX PARTE REEXAMINATION CERTIFICATE (9017th)
## United States Patent
### Pieroni et al.

(10) Number: **US 6,526,808 C2**

(45) Certificate Issued: **May 15, 2012**

(54) SMOKE AND CLEAN AIR GENERATING MACHINE FOR DETECTING PRESENCE AND LOCATION OF LEAKS IN A FLUID SYSTEM

(75) Inventors: Kenneth Alan Pieroni, Fullerton, CA (US); Jim Eli Saffie, Santa Monica, CA (US)

(73) Assignee: Envirotech, Inc., Costa Mesa, CA (US)

Reexamination Request:
No. 90/011,916, Sep. 23, 2011

Reexamination Certificate for:
Patent No.: 6,526,808
Issued: Mar. 4, 2003
Appl. No.: 09/348,320
Filed: Jul. 7, 1999

Reexamination Certificate C1 6,526,808 issued Jul. 19, 2011

Certificate of Correction issued Nov. 15, 2011.

(51) Int. Cl.
G01M 3/20 (2006.01)
G01M 3/28 (2006.01)

(52) U.S. Cl. ..................................................... 73/40.7

(58) Field of Classification Search ........................ None
See application file for complete search history.

(56) References Cited

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,916, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—John Heyman

(57) ABSTRACT

A smoke and clean air generating machine for detecting the presence and location of leaks in a fluid system (e.g. the evaporative or brake system of a motor vehicle). A source of gas (e.g. air or nitrogen) under pressure is delivered to a smoke generating apparatus or to a flow meter by way of a multi-position selector valve. With the selector valve in a first position, gas is delivered to the system under tests via the flowmeter to detect the presence of a leak in need of repair depending upon the reading of the flow meter. With the selector valve in a second position, gas is delivered to the smoke generating apparatus so that smoke can be supplied to the system under test to locate the leak. With the selector valve in a third position between the first and second positions, pressure is bled from the machine to disable the smoke generating apparatus and thereby terminate the production of smoke.



US 6,526,808 C2

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

2

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 9 and 10 is confirmed.
Claims 1-7 and 8 were not reexamined.

* * * * *

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1861 DOC  (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [✗] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Todd M. Malynn (State Bar No. 181595)
FELDMAN GALE, P.A.
880 West First Street, Suite 315
Los Angeles, CA 90012
Telephone: (213) 625-5992
Facsimile: (213) 625-5993

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STAR ENVIROTECH, INC. a Delaware Corporation | CASE NUMBER |
| PLAINTIFF(S) | **SACV12 1861** DOC(MLGx) |
| v. | |
| REDLINE DETECTION, LLC, a California limited liability company; and Kenneth A. PIERONI, an individual | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Todd M. Malynn_____, whose address is _Feldman Gale, PA, 880 West First St., Suite 315, Los Angeles, California 90012_____.   If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   OCT 2 5 2012

By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                   SUMMONS

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>STAR ENVIROTECH, INC., a Delaware Corporation | DEFENDANTS<br>REDLINE DETECTION, LLC, a California limited liability company; and<br>KENNETH A. PIERONI, an individual. |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br>Todd M. Malynn (SBN 181595)<br>FELDMAN GALE, P.A.<br>880 W. First Street, Suite 315, Los Angeles, CA 90012; Tel: (213) 625-5992 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☑ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No ☑ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Complaint for Patent Infringement, False Advertising and Unfair Competition

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**SACV12 1861**

FOR OFFICE USE ONLY: Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)        CIVIL COVER SHEET        Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
   ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
   ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
   ☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
   ☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date Oct. 25, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |