UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| STAR ENVIROTECH, INC.,<br><br>Plaintiff,<br><br>v.<br><br>REDLINE DETECTION, LLC et al.,<br><br>Defendants. | No. SA CV 12-01861-JGB (DFMx)<br><br>ORDER FOR SANCTIONS AND RECOMMENDATION FOR ADVERSE INFERENCE INSTRUCTION |

Before the Court is a motion from Plaintiff Star Envirotech, Inc. ("Star") requesting terminating, instructional, and monetary sanctions against Defendants Redline Detection, LLC and Kenneth A. Pieroni (collectively, "Redline" or "Defendants") arising from Defendants' alleged spoliation of evidence and other discovery misconduct. See Dkt. 187. Since Star filed its initial request for sanctions on June 22, 2015, the Court has held lengthy hearings on July 21 and September 15, 2015, see Dkt. 234 and 257; ordered interim relief, see Dkt. 234 and 238; and received supplemental briefing, see Dkt. 294 and 329. As the Court has indicated, the Court has been and remains troubled by Defendants' conduct in these proceedings. For the reasons stated

in this Order and at the various hearings, the Court grants a monetary sanction of attorney's fees and costs associated with Defendants' discovery misconduct and recommends a jury instruction to address the belated production of certain information, but declines to recommend terminating sanctions.

## 1.0   Relevant Background

Star's motion for sanctions initially focused on (1) Redline's failure to comply with two orders of this Court directing Redline to produce customer information and sales data and (2) Defendants' failure to preserve and active destruction of key documents and concealment of other evidence. See Dkt. 206 at 5. Star's reply memorandum added to its list of grievances Defendants' failure to produce important documents before depositions of their principals. See Dkt. 214 at 4-5. Later, after the Court ordered two depositions re-opened as interim relief, Star added Defendants' misinterpretation of that order as an additional basis for sanctions. See Dkt. 294 at 9-11. The Court will discuss each of these issues in turn.

### 1.1   Delays in Redline's Production of Sales Data

On February 27, 2015, this Court granted in part Star's motion to compel and ordered Redline to produce supplemental responses and further documents responsive to Star's Interrogatory Nos. 1 and 2 and RFP No. 3. Dkt. 118 at 7-10.[1] Specifically, the Court ordered Redline to provide "financial

---

[1] As summarized in the Court's order, these written discovery requests sought the following information:

Interrogatory No. 1 seeks the identity of every person to whom or entity to which Redline has "ever sold or offered for sale" the Accused Products. Plaintiff further seeks monthly or quarterly data showing the number of Accused Products sold, the identities of their manufacturers, the identities of their purchasers, the price of each sale, and Redline's gross

2

and sales information dating from July 2008" and "documents relating to Redline's costs, revenues, and profits associated with the manufacture and sale of Accused Products within the United States . . . from July 19, 2008." Id. at 9, 10.

Twenty-one days after the Court's order, Redline supplemented its responses to Interrogatory Nos. 1 and 2 by identifying 600 pages of documents under Rule 33(d). See Dkt. 148-3 at 3. What Redline did not do was tell Plaintiff was that it was not producing any information from before July 2011,

> and net revenues, costs, and profits from those sales. Plaintiff seeks data going back to October 2006. . . .
>
> Interrogatory No. 2 seeks largely the same information. Specifically, Plaintiff seeks the model name or part number of Accused Products and monthly or quarterly data showing: the quantity made in the United States and the identity and location of the manufacturers; the quantity sold in the United States, the identities of sellers and purchasers, the sale prices, and the gross and net revenues, costs, and profits associated with such sales; the quantity offered for sale in the United States, by whom, and at what price; the quantity imported into the United States and the identity of the importer; and the quantity used in the United States, by whom, and for what purpose. . . .
>
> . . .
>
> By RFP No. 3, Plaintiff seeks "[a]ll documents related to the Accused [] Products made, used, sold, [or] offered for sale in the United States, including, but not limited to, documents relating to the costs, revenues, or profits associated with these from October 2006 to present."

Id. at 7, 10.

Redline having determined that it wanted to amend the parties' protective order to provide further protection for such information.

In light of what Star viewed as Redline's refusal to produce what it had been ordered to produce, Star moved for sanctions on May 12, 2015. <u>See</u> Dkt. 148. The Court held a hearing on Star's motion on June 2. <u>See</u> Dkt. 174. After the hearing, on June 9, the Court issued an order in which it stated its frustration with Redline's conduct:

> The Court finds it hard to imagine any good-faith justification for why Defendant's counsel waited more than six weeks after the Court's February 27 order to tell Plaintiff that it sought additional protection for its pre-July 2011 customer information. Indeed, Defendant's counsel at oral argument offered little if any justification for this course of conduct. . . . It is apparent to the Court that Defendant should have addressed this issue more proactively and sought the Court's intervention at a far earlier stage if it felt strongly about the necessity of further protection for this information.

Dkt. 178 at 2. The Court then ordered Redline to produce additional information as follows:

> . . . [T]he Court believes there were the evident shortcomings in how Defendant has handled portions of its obligations with respect to the Court's February 27 order. Thus, the Court ORDERS as follows:
>
> A.    With respect to customer information for sales before July 2011, the Court ORDERS Defendant to produce all such material responsive to

4

Interrogatory Nos. 1 and 2 and RFP No. 3 within seven (7) days of this Order.

B.    With respect to leak detection systems that both (1) Defendant sold under labels other than "Smoke Pro Total Tech" and "Smoke Pro Air Complete" and (2) test for EVAP and are compatible with nitrogen, Defendant is ordered to produce all material responsive to Interrogatory Nos. 1 and 2 and RFP No. 3 within fourteen (14) days of this Order.

Id. at 3.

Unfortunately, this order did not put an end to the parties' continued dispute about Redline's production of information responsive to Interrogatory Nos. 1 and 2 and RFP No. 3. Less than two weeks later, on June 22, Star filed the instant motion for sanctions, relying in part on Redline's failure to produce documents as ordered by the Court on February 27 and June 9. See Dkt. 206 at 8 ("Defendants have to-date failed to produce any of the invoices, shipping records and other documents that were required by the [Court's February 27 and June 9] Orders, which would enable Plaintiff to identify the end-users of Defendants' product.") and 16 ("Redline repeatedly flouted this Court's discovery orders and has failed to produce any of the sales documents ordered by the Court on February 27 and June 9, 2015. In order deprive Plaintiff with the ability to identify the end users of its products, Redline has failed to produce the invoices, shipping orders and similar documents as ordered by the Court almost six months ago.").

Defendants' initial opposition contained no substantive response related to Redline's alleged failure to produce these documents, instead accusing Star of a "rabble-rousing . . . one-side diatribe" that neglected to mention what Defendants contended were Star's own deficient discovery responses. Dkt. 203

5

at 7. Defendants also filed a surreply; it, too, offered no substantive response on Redline's failure to produce customer and sales information. See Dkt. 229. It nonetheless appears from the record that Redline produced spreadsheets and invoices in June and early July that provided customer information for some sales from June 2008 to late 2012. See Dkt. 337 at 2-3.

The Court held the first of two hearings on Star's motion for sanctions on July 21. Dkt. 234. During the hearing, Star's counsel turned from Redline's failure to produce pre-July 2011 sales information to Redline's failure to produce sales documents from December 2012:

> They did give us now after we filed the motion for sanctions some of the sales and orders and purchase orders and invoices from 2008. But they haven't given us what you've ordered them to provide to us which is the documentation from 2000- -- December 2012 forward. They basically have said we don't care that Magistrate McCormick ordered it in the February 27th order. He didn't go ahead and reorder it again in the June order. And, therefore, we're not producing it. So, we haven't gotten that.

Dkt. 239 at 22. Redline's counsel explained that Redline's interpretation of the Court's June 9 order was that no relief was warranted with respect to documents related to post-December 2012 sales. Id. at 34. The Court asked Redline's counsel what substantive basis Redline had to resist producing post-December 2012 information. Id. at 35. Redline's counsel explained that "we stopped marketing our products to be compatible with nitrogen as soon as the complaint was filed in October of 2012. So, any subsequent sale after October of 2012 was not as a result of our marketing [] nitrogen compatibility." Id. at 35. The Court overruled that objection, id., and ordered Redline to produce

6

"customer information for sales from December 2012 to the present within ten days of this order," Dkt. 234. The Court also ordered that such information be produced in "native format." Id.

On July 30 and August 13, Redline produced nearly 10,000 pages of invoices to comply with the Court's orders. See Dkt. 337 at 3, 266-68; see also Dkt. 294 at 7-9. Much of what Redline produced was to remedy a "glitch" in its earlier production which had caused the vast majority of its 2008 through 2012 invoices to be omitted. See Dkt. 337 at 3. On September 15, the Court confirmed that Redline had made a complete production, although discussion revealed that the production ordered on July 21 had not been made in "true" native format. See Dkt. 266 at 5-6.[2]

### 1.2   The Re-Opened Parker and Negandhi Depositions

In its reply brief, Star asked for an order compelling two witnesses to re-appear for their depositions because key documents were produced after their depositions were taken. See Dkt. 214 at 14. During the July 21 hearing, Star widened its request to ask that four depositions be re-opened. Dkt. 239 at 25. Several days after the hearing, the Court issued an interim order directing that the depositions of Sam Negandhi and Zachary Parker be re-opened:

> First, the Court finds that re-opening of Negandhi's deposition is warranted by Defendants' late production of Powerpoint presentations which discuss the compatibility of Defendants' products with inert gases (such as nitrogen). Defendants are

---

[2] Redline produced such documents in a searchable PDF format. Dkt. 266 at 6. The issue of whether this production was in compliance with the Court's order would require a tangential discussion about what is meant by "native format," the resolution of which is not required here.

ORDERED to make Negandhi available for a deposition of up to 2 hours. The parties shall meet-and-confer about the time, date, and location of the re-opened deposition within seven (7) days of the date of this Order.

Second, the Court finds that re-opening of Zachary Parker's deposition is warranted by Defendants' late production of certain advertisements, the above-referenced Powerpoint presentation, and the non-production of a 2008 e-mail submitted as Exhibit 2 to Plaintiff's reply. Defendants are ORDERED to make Parker available for a deposition of up to 4 hours. The parties shall likewise meet-and-confer about the time, date, and location of the re-opened deposition within seven (7) days of the date of this Order.

Dkt. 238.

On August 26, Parker, Redline's President, appeared for his re-opened deposition. Dkt. 254 at 84. Shortly after the re-opened deposition commenced, counsel began to dispute whether this Court's order placed limitations on the subject matter to be covered by the deposition. Id. at 88 (Depo. at 15). After several more pages of transcript, Star's counsel asked whether Parker had a particular belief about competitors' advertising. Id. at 91 (Depo. at 28-29). Redline's counsel then interjected:

MR. VEGH: You're outside the scope of the Judge McCormick's August 6, 2015 order. And I'm going to instruct him not to answer.

MR. MALYNN: We disagree that the judge

8

placed any limits on my four hours. The judge said there was – the judge said that there was good cause and he provided reason for it. He did not place limits what – on the scope of my deposition.

        MR. VEGH: Paragraph 4--

        MR. MALYNN: We can agree to disagree, but you stated your instruction.

        Q. Are you going to follow his instruction?

        A. Yes.

Id. (Depo. at 29). Throughout the rest of the transcript, several more such instructions were given and followed. E.g., id. at 113 (Depo. at 115), 117 (Depo. at 131-32).[3]

    The next day, Negandhi appeared for his re-opened deposition. See Dkt. 261 at 2. Immediately after it commenced, Redline's counsel instructed Negandhi not to answer a question on the basis that it was "outside the scope of the August 6, 2015 order." Id. at 4 (Depo. at 205). Negandhi followed that instruction and several more that followed. Id. at 4-6.

    The Court had not in fact placed any limits upon the scope of the re-opened depositions when it ordered Redline to make the witnesses available. At the hearing on September 15, the Court expressed frustration that Redline's

---

[3] At other times Parker ignored his counsel's instructions and answered questions that were allegedly outside the scope. Both parties complained about deposition conduct during arguments on Star's motion, so the Court will observe that the transcripts from the re-opened depositions reflect a significant amount of incivility by both lawyers. Counsel at times engaged in lengthy exchanges, each accusing the other of misconduct and unprofessionalism. Regardless of the merits, neither side comes across favorably, and to the extent either lawyer thinks that they served their client well during these depositions, that impression is misplaced.

counsel had not sought clarification of the Court's order before the deposition:

> I did not intend for the depositions to be limited to the topics or to the issues identified in my August 6th order. I don't know how I could have been -- I don't know how the order could have been interpreted that way to be candid.
>
> . . .
>
> [I]t's unfortunate because I had hoped to give the plaintiff some relief that was short of some of the other relief that they sought. And we haven't really accomplished that.
>
> . . .
>
> If there was a lack of [clarity] in my order, gosh, it should have been addressed earlier, which is something you and I have had a conversation about on at least one other occasion. So, I find that troubling and concerning.

Dkt. 266 at 8-10. Apparently recognizing the Court's disfavor, Redline offered to make Parker and Negandhi available again for deposition at Redline's expense. Id. at 47. But Star had already disclaimed an interest in taking either witness's deposition for a third time. Id. at 32.

### 1.3    Redline's Destruction of Advertising and Other Materials

The other portion of Star's motion for sanctions argued that Defendants "failed to preserve key documents and evidence directly related to this case (even after being served with this lawsuit), but also actively and intentionally destroyed documents and secreted electronic and other evidence." Dkt. 206 at 5. Star specifically cited Parker's deposition testimony that Redline had destroyed advertisements, manuals, and DVDs in which Redline described the

10

compatibility of its products with nitrogen. Id. at 8-10.

In opposing Star's motion, Redline noted that it had maintained electronic copies of all of these materials, but had "stopped printing and circulating physical copies of these advertising materials." Dkt. 203 at 3. Redline argued that it was not obligated to keep identical copies of its advertising materials and operating manuals. Id. at 5. In reply, Star pointed to several Redline advertisements it had obtained from retailers that were never produced by Redline to show that Redline had not in fact retained electronic copies of its materials and had in fact destroyed evidence. Dkt. 214 at 5. In its surreply, Redline argued that nearly all of these documents were created by the retailers themselves and contended that Star had cited to only two Redline advertisements that it had not produced. Dkt. 229 at 2-5. Redline argued that the omission of these two advertisements was not prejudicial, as they were cumulative of hundreds of other advertisements and manuals that were produced. Id. at 5.

**2.0  Legal Standard**

The Court's authority to sanction a party stems from its inherent power to impose sanctions in response to litigation misconduct, see Chambers v. NACSO, Inc., 501 U.S. 32, 45-46 (1991) (recognizing inherent power of courts to impose appropriate sanctions where conduct disrupts judicial process), and from Federal Rule of Civil Procedure 37, under which sanctions are available against a party "who fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A), (C); Lewis v. Ryan, 261 F.R.D. 513, 518 (S.D. Cal. 2009). Available sanctions range from monetary sanctions to adverse inference instructions to dismissal. Keithley v. Home Store.com, Inc., No. 03-04447, 2008 WL 3833384, at *2 (N.D. Cal. Aug. 12, 2008).

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or

reasonably foreseeable litigation. <u>Reinsdorf v. Skechers U.S.A., Inc.</u>, 296 F.R.D. 604, 625 (C.D. Cal. 2013). The bare fact that evidence has been altered or destroyed "does not necessarily mean that the party has engaged in sanction-worthy spoliation." <u>Ashton v. Knight Transp., Inc.</u>, 772 F. Supp. 2d 772, 799-800 (N.D. Tex. 2011). Courts typically apply the following test to determine whether to impose sanctions for spoliation, requiring the party seeking sanctions to establish: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. <u>Reinsdorf</u>, 296 F.R.D. at 626; <u>see also</u> <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). For spoliation purposes, "relevance" is a two-pronged finding of relevance and prejudice, because to issue sanctions, the absence of the evidence must be prejudicial to the party alleging spoliation. <u>Reinsdorf</u>, 296 F.R.D. at 627 (citing <u>Victor Stanley v. Creative Pipe Inc.</u>, 269 F.R.D. 497, 531 (D. Md. 2010); <u>Rimkus Consulting Group, Inc. v. Cammarata</u>, 688 F. Supp. 2d 598, 616 (S.D. Tex. 2010)).The party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim. <u>Reinsdorf</u>, 296 F.R.D. at 626.

By contrast, sanctions under the Court's inherent power are available if "preceded by a finding of bad faith, or conduct tantamount to bad faith," such as recklessness "combined with an additional factor such as frivolousness, harassment, or an improper purpose." <u>Gomez v. Vernon</u>, 255 F.3d 1118, 1134 (9th Cir. 2001); <u>Fink v. Gomez</u>, 239 F.3d 989, 994 (9th Cir. 2001). Dismissal sanctions under a court's inherent power may be imposed upon a finding of willfulness, fault, or bad faith. <u>Leon v. IDX Systems Corp.</u>, 464 F.3d 951, 958 (9th Cir. 2006).

Under Rule 37, where a party fails to provide information, the Court may order payment of attorney's fees, inform the jury of the party's failure, or direct that certain facts be taken as established by the jury. See Fed. R. Civ. P. 37(b)(2)(A)(i)-(iv), (c). The Court need not find bad faith before imposing these sanctions. Hyde & Drath v. Baker, 24 F.3d 1162, 1171 (9th Cir. 1994) ("We have not required a finding of bad faith on the part of the attorney before imposing sanctions under Rule 37."); Keithley, 2008 WL 3833384 at *3 ("Sanctions for violations of Rule 37 . . . may be imposed for negligent conduct."). Moreover, the Court may, in deciding whether to grant a motion for sanctions under Rule 37, "properly consider all of a party's discovery misconduct . . . including conduct which has been the subject of earlier sanctions." Payne v. Exxon Corp., 121 F.3d 503, 508 (9th Cir. 1997). Furthermore, even if a party eventually complied with a discovery order, belated compliance does not preclude the imposition of sanctions. Compass Bank v. Morris Cerullo World Evangelism, No. 13-0654, 2015 WL 3442030, at *5 (S.D. Cal. May 28, 2015); see also North Am. Watch Corp. v. Princess Ermine Jewels, 786 F.2d 1447, 1451 (9th Cir. 1986).

In deciding whether to grant a motion for sanctions under Rule 37(b)(2)(A) for noncompliance with discovery, the Court should consider five factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to [the party seeking sanctions]; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Rio Props., Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1022 (9th Cir. 2002); Computer Task Group, Inc. v. Brotby, 364 F.3d 1112, 1115 (9th Cir. 2004). "Where a court order is violated, the first and second factors will favor sanctions and the fourth will cut against them." Computer Task Group, Inc., 364 F.3d at 1115. "Therefore, it is the third and fifth factors that are decisive." Payne, 121 F.3d at 507.

13

Finally, a court should ensure that any sanctions order is narrowly tailored to fit the circumstances in a given case. <u>Keithley</u>, 2008 WL 3833384, at \*4. To put it differently, the punishment should fit the crime. <u>See</u> <u>Anderson v. Beatrice Foods Co.</u>, 900 F.2d 388, 395 (1st Cir. 1990) ("[T]he judge [imposing sanctions] should take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms.").

**3.0    Discussion**

**3.1    Redline's Conduct**

**3.1.1 There Is No Evidence That Redline Committed Spoliation**

Star's claims of actual spoliation have consistently focused on Redline's disposal of advertising documents and operating manuals that depict, reference, or tout how Redline's products are compatible with nitrogen. <u>See, e.g.</u>, Dkt. 294 at 11. Redline concedes that it destroyed materials that referenced nitrogen-compatibility, but Redline contends it did so to prevent their use after Star filed this lawsuit alleging that such materials violated the '808 patent. <u>See</u> Dkt. 203 at 2-3.

Star argues that it was "never able to identify how many [advertisements or operating manuals] were destroyed." <u>See</u> Dkt. 294 at 11. But the relevance of whether Redline destroyed 10 brochures or 10,000 brochures has never been established, and the Court agrees with Redline that production of materials in Redline's possession would reveal nothing about the extent to which those materials had been disseminated. Moreover, the record shows that Star has exemplars of the vast majority of Redline's advertisements and operating manuals, and the Court also agrees with Redline that the duty to preserve does not require it to preserve "every shred of paper." <u>See</u> <u>Zubulake</u>, 220 F.R.D. at 217.

Nor is the Court persuaded that Redline acted with a culpable state of mind when disposing of any such documents. Tellingly, Redline does not

14

contest that it referenced its products compatibility with nitrogen for many years. See Dkt. 229 at 5 ("Redline has readily admitted that it . . . advertised [that its smoke machines were compatible with nitrogen]."). It is thus difficult to imagine what nefarious purpose would have been served by destroying advertisements, manuals, and brochures, other than Redline's stated purpose of ensuring that those materials were no longer disseminated. The Court therefore finds that the record does not support a finding that Redline engaged in sanctions-worthy spoliation of evidence.

### 3.1.2 Redline Delayed Production of Sales Data and Customer Information

In contrast, the Court finds that the record establishes that Redline belatedly complied with its discovery obligations with respect to sales data and customer information. No fewer than three orders were required to force Redline to produce the full body of information responsive to Interrogatory Nos. 1 and 2 and RFP No. 3. Even then Redline complied only after Star moved for sanctions. Redline thus delayed Star's receipt of this discoverable information by several months.

### 3.1.3 Redline Placed Unwarranted Restrictions on Its Witnesses During Depositions Re-Opened by the Court

The record also establishes that Redline unjustifiably limited the scope of the re-opened depositions of Parker and Negandhi. The Court ordered those depositions as interim relief on Star's motion for sanctions, attempting to ameliorate some of the prejudice caused by Redline's belated production of documents. The Court imposed no restrictions on what questions could be asked at the re-opened depositions. Redline's counsel interpreted the Court's order incorrectly, perhaps betraying an underlying disagreement with the Court's order, or perhaps misunderstanding the Court's purpose. Regardless, as the Court indicated at the hearing, any uncertainty about the Court's order

should have been resolved differently than by ordering the witnesses not to answer Star's questions.

### 3.2    Sanctions Warranted by Redline's Conduct

#### 3.2.1    Terminating Sanctions Are Not Warranted

The Court finds that terminating sanctions are not warranted. The Ninth Circuit has indicated that the "most critical factor to be considered in case-dispositive sanctions is whether a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts." <u>Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,</u> 482 F.3d 1091, 1097 (9th Cir. 2007) (internal quotation marks omitted). Here, there is no evidence that Redline's conduct has interfered with Star's ability to access the true facts. Certainly Star will be able to prove that Redline advertised that its products were compatible with nitrogen, even though Redline destroyed advertisements and manuals. Star also had the information responsive to Interrogatory No. 1 and 2 and RFP No. 3 by mid-August, several weeks before the parties' discovery cutoff.

The Ninth Circuit has indicated that "[d]elay alone" is generally "insufficient prejudice." <u>Adriana Int'l. Corp. v. Thoeren</u>, 913 F.2d 1406, 1412 (9th Cir. 1990). The Ninth Circuit has also indicated that a dismissal sanction without some kind of warning is disfavored. <u>See</u> <u>Allen v. Bayer Corp. (In re Phenylpropanolamine (PPA) Prods. Liab. Litig.)</u>, 460 F.3d 1217, 1228-29 (9th Cir. 2006). Thus, while the Court believes that other, less drastic sanctions are warranted, it does not recommend the imposition of terminating sanctions.

#### 3.2.2    An Adverse Inference Instruction Is Warranted by Redline's Belated Production of Its Sales Data

The Court does believe that an adverse inference instruction is warranted by Redline's conduct. "Like many other sanctions, an adverse inference instruction can take many forms," and its harshness should be "based on the

nature of the spoliating party's conduct—the more egregious the conduct, the more harsh the instruction." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., 685 F. Supp. 2d 456, 470 (S.D.N.Y. 2010). In its harshest form, reserved for instances involving bad faith, the jury is instructed that certain facts are deemed admitted and must be accepted as true. Id.; see also Apple Inc. v. Samsung Elec. Co., Ltd., 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012). A less punitive instruction permits (but does not require) the jury to presume that the evidence was relevant and favorable to the other party. Pension Comm., 685 F. Supp. 2d at 470; Apple Inc., 881 F. Supp. 2d at 1150.

It took a motion to compel, a motion for contempt, a motion for sanctions, and three orders from this Court to dislodge from Redline the entirety of its information responsive to Interrogatory Nos. 1 and 2 and RFP No. 3. By even the most conservative measure, that was one motion and one order too many. Additionally, the record shows that Redline engaged in tactics designed to delay its production, such as waiting weeks after the Court's deadline for producing responsive information to ask for a change to the protective order.[4] The Court also considers Redline's other discovery conduct,

---

[4] Any doubt that Redline produced this information with great reluctance is diminished by Parker's declaration, in which he complained about being ordered to do so:

> It is my sincere desire that Redline will one day soon get our day in court to address the legal issues at hand rather than Star trying to obfuscate the matter by attempting sanctions because there should be 11,873 documents not 11,863. Redline was required to turn over thousands of pages of very sensitive and critical customer contact and sales data going back over three full years prior to any alleged infringement. Redline was required to provide this information to Star, our only substantial competitor, and this will have very

17

such as its misinterpretation of the Court's order re-opening two depositions, in determining whether an adverse instruction is warranted. Finally, the fact that Redline eventually complied with this Court's orders does not preclude the imposition of sanctions.

In sum, for the reasons stated here and on the record, the Court finds that an instruction is warranted, albeit a less punitive instruction of the type that permits the jury to presume that the belatedly-produced evidence was helpful to Star and harmful to Redline. Therefore, the Court recommends that the District Judge present an instruction similar to the following to the jury at trial:

> During pretrial discovery, the Court entered multiple orders directing Redline to produce information about Redline's sales so that Star could use that information to calculate its damages. Although Redline eventually complied with the Court's orders, it did so after numerous delays. Accordingly, Star had to rely on information that was not fully complete to calculate its damages. You may infer that Redline did not produce information about its sales data to Star when it should have, because it

real and long lasting damage to Redline. Star collected several years of customer data on the first lawsuit, four more years of customer data on this lawsuit, and they will attempt to get the balance of Redline customer data on the newly filed lawsuit. Seems like suing Redline is a great opportunity for Star to gain tremendously sensitive customer and market information from the industry leader.

Dkt. 232 at 4.

18

believed that delaying production of that information would help Redline and hurt Star.

Such an instruction is narrowly tailored to the harm caused by Redline's belated production. It is a far less drastic sanction than a terminating sanction. It is warranted by the entirety of Redline's discovery conduct, which has betrayed both an unwillingness to comply with the Court's orders and a willingness to delay production of evidence.

### 3.2.3 An Order Awarding Attorney's Fees and Costs Is Warranted by Both Redline's Belated Production and Its Handling of the Parker and Negandhi Depositions

The Court also finds that a monetary sanction in the form of attorney's fees and costs is warranted. Redline's belated production of documents ultimately forced Star to file motions and seek the Court's intervention above and beyond what would have been substantially justified under the Federal Rules. A monetary sanction is necessary to make Star whole. The Court does not conclude that Redline should be responsible for 100% of Star's attorney's fees and costs associated with Star's motion for sanctions. However, the Court will order Redline to pay at least a portion of Star's attorney's fees and costs associated with the motion for sanctions. In addition, the Court will order Redline to pay 100% of Star's attorney's fees and costs associated with the re-opened depositions. These monetary sanctions are within the undersigned's authority as a United States Magistrate Judge and are accordingly not part of the Court's recommendation to the assigned District Judge.

Star shall submit, within fourteen (14) days of the Court's order, a declaration setting forth the amounts incurred in connection with its motion for sanctions and re-opening the Parker and Negandhi depositions. Redline shall file any brief in opposition to Star's declaration within seven (7) days of Star's filing.

**4.0   Conclusion**

For the reasons stated above, Star's motion for sanctions is GRANTED in part and DENIED in part. Under Fed. R. Civ. P. 72(b), objections to the Court's recommended sanction must be filed within fourteen (14) days of service of this order.

Dated:  December 16, 2015

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge